**THE SUPERIOR COURT OF THE STATE OF DELAWARE**

|  |  |  |
|---|---|---|
| REO TRUST 2017-RPL1, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. NO. N20L-10-029 DJB |
| | ) | |
| SHORT SALE, LLC, | ) | |
| Defendant. | ) | |
| | ) | |

Date Submitted: May 28, 2026
Date Decided: June 26, 2026

## ORDER ON REMAND FOLLOWING EVIDENTIARY HEARING

1.  By Order dated June 18, 2024, the Delaware Supreme Court remanded this matter to this Court for an expansion of the record and directed this court to make additional findings of fact.[1] In its remand Order, the Supreme Court permitted this Court reconsideration of "any aspect of its decision on which those factual findings bear."[2] Before the Supreme Court was Plaintiff REO Trust 2017-RPL1's (hereinafter "REO Trust") appeal of this Court's August 1, 2023, Opinion.[3]

---

[1] *REO Trust 2017-RPL1 v. Short Sale, LLC and FCS Lending, LLC*, No. 306, 2023, LeGrow, J. (Jun. 18, 2024) (ORDER).
[2] *Id.*
[3] *REO Trust 2017-RPL1 v. Short Sale, LLC and FCS Lending, LLC*, No. 306, 2023, Docket Entry (hereinafter "Case No. 306, 2023 D.I. ") 1.

Following appeal, Defendant Short Sale, LLC (hereinafter "Short Sale") and interested party FCS Lending, LLC (hereinafter "FCS"), jointly cross-appealed.[4]

2. In accordance with that Order, this Court held a two-part evidentiary hearing[5] and accepted post-hearing briefing from the parties.[6] The Court's findings of fact are set forth below.

## Background and Procedural History

3. Relevant to this litigation are three Delaware entities. Plaintiff REO Trust is a Delaware statutory trust and the junior mortgagee on 313 S. Broom Street, Wilmington, DE 19805 (hereinafter "the Property"). Defendant Short Sale is a Delaware limited liability company and the record owner of the Property. FCS is an interested party to this litigation as the priority mortgage holder on the Property.

4. REO Trust initiated foreclosure proceedings in Superior Court on October 30, 2020.[7] Following a Sheriff sale on the Property, on May 10, 2021, Short Sale moved to set aside the sale; FCS, as an interested party, moved to enforce payment of sale proceeds.[8] REO Trust responded to both motions on May 19,

---

[4] Case No. 306, 2023 D.I. 6.
[5] *REO Trust 2017-RPL1 v. Short Sale, LLC*, N20L-10-029 DJB, Docket Item (hereinafter "D.I.") D.I. 77 and 82. Given the two cases referenced, citations to the Supreme Court Docket will read: "Case No. 306, 2023 D.I. __" and the Superior Court Docket will read: "D.I. __".
[6] D.I. 87-89, 94-98, 100.
[7] D.I. 1.
[8] D.I. 13,14.

2021.[9]  In its only filing in the initial proceedings, on May 28, 2021, the New Castle County Sheriff filed a Response in Opposition only to FSC's Motion to Enforce Payment.[10]  Short Sale and FSC jointly replied in support of both motions on March 17, 2023.[11]  Argument was held on October 25, 2022.[12]  Due to continued questions that remained, subsequent argument was held on February 9, 2023.[13]  Following the submission of supplemental submissions,[14] this Court issued its Opinion which denied the Motion to Set Aside the Sheriff's Sale and granted the Motion to Enforce Payment of the Proceeds on August 2, 2023.[15]

4.    The following are the facts previously found by this Court in its Opinion:

> In 2018, Roberta Ziefert was the record owner of 313 S. Broom Street, Wilmington, DE 19805 (hereinafter "the Property"), a townhome located within the condominium community of Towne Estates.  Ziefert died on August 25, 2018, and at the time of her death, the Property was subject to two mortgages.  FCS Lending, LLC (hereinafter "FCS") held the senior mortgage; Plaintiff REO Trust 2017-RPL1 (hereinafter "Plaintiff" or "REO Trust") held the junior mortgage.  After Ziefert's Estate failed to pay condominium fees owed on the Property, Towne Estates, the homeowners association (hereinafter "HOA") of the Property, filed a debt action against Ziefert's Estate and eventually obtained a judgment against Ziefert's Estate in the Justice of the Peace

---

[9] D.I. 17, 18.
[10] D.I. 19.
[11] D.I. 46.
[12] D.I. 40.
[13] D.I. 42.
[14] D.I. 43-46.
[15] D.I. 51, *REO Tr. 2017-RPL1 v. Short Sale, LLC*, 2023 WL 3774654, at *2 (Del. Super. Ct. June 1, 2023), as amended (Aug. 1, 2023) (internal citations omitted).

Court of Delaware on July 22, 2019. Towne Estates transferred its judgment to this Court on August 16, 2019, and satisfied the judgment through a Sheriff's sale of the Property on December 10, 2019. Defendant Short Sale, LLC (hereinafter "Short Sale") purchased the Property at the Sheriff's sale.

During the time the HOA pursued its judgment lien, REO Trust filed its first foreclosure action in this Court on July 26, 2019, through a *sci fa sur* writ and listed the Ziefert Estate as the sole defendant. The Estate, despite being properly noticed, failed to respond and ultimately REO Trust moved for default judgment on March 24, 2020, a little over three months after the Property's sheriff sale on the HOA judgment. On September 18, 2020, the Prothonotary issued a writ directing the Sheriff of New Castle County to schedule a second sheriff's sale of the Property. REO Trust, however, moved to vacate its judgment over Ziefert's Estate and requested a stay of the sheriff's sale on October 9, 2020, citing the fact that the "property [was] sold by a junior lienholder."

Less than a month later, on October 30, 2020, REO Trust filed the instant foreclosure action, solely naming Short Sale as a defendant. Despite being served with a copy of the Complaint, Short Sale did not file an Answer or any responsive pleading. REO Trust moved for default judgment on January 22, 2021, which this Court granted. The Prothonotary issued a writ directing the Sheriff of New Castle County to conduct a sale of the Property, and on April 13, 2021, Short Sale, for the second time, purchased the Property. Immediately following this purchase, Short Sale transferred its interest in the Property to FCS.[16]

5.     In its decision, the Court found Short Sale's delayed challenge to the sale "inexplicable," yet nonetheless heard the motion given the jurisdictional challenge raised.[17]    Ultimately, a defect in the process was found due to REO Trust having failed to notice all required parties. Ultimately, however, the sale was not

---

[16] *Id.*
[17] *REO Tr. 2017-RPL1*, 2023 WL 3774654, at *2-3.

set aside, as neither moving party was prejudiced by the defective notice and the interests of justice did not so require.[18]

6. With respect to FCS's Motion to Enforce the Payment of Proceeds, in reliance upon the Delaware Supreme Court's decision in *Eastern Savings Bank, FSB v. CACH, LLC*,[19] this Court held, "Delaware's 'first in time, first in line' priority means the first party to record its lien has priority in sale distribution."[20] Ultimately, "regardless of who initiates a foreclosure action first, FCS's first priority mortgage has priority in this sheriff's sale distribution."[21]

7. On appeal, REO Trust contends that this Court's decision should be reversed, arguing Short Sale waived its right to challenge the Second Sheriff's Sale. REO Trust maintains the Estate was not a necessary party and a defect in the process occurred. Further, REO Trust argues FSC was not entitled to join in the distribution of proceeds simply because it possessed a "first priority" mortgage.[22]

8. Short Sale and FCS cross-appealed as to the denial of the motion to vacate the Sheriff's Sale on the basis that (i) REO Trust's foreclosure action was "void *ab initio* because the Superior Court had no subject matter jurisdiction" due to

---

[18] *REO Tr. 2017-RPL1*, 2023 WL 3774654, at *3, 5.
[19] 55 A.3d 344 (Del. 2012).
[20] *REO Tr. 2017-RPL1*, 2023 WL 3774654, at *6.
[21] *Id*.
[22] Case No. 306, 2023, D.I. 7.

the notice defect; and (ii) the appellees, the Estate, and the public as a whole were prejudiced by REO Trust's failure to provide the statutorily required notice.[23]

9. In its review of these claims, the Supreme Court remanded the case back to Superior Court:

> …so that the parties may develop the factual record regarding the circumstances underlying the Second Sheriff's Sale, the assignment, and the parties' interests in the outcome of the proceedings. After receiving the parties' evidence, the Superior Court shall make factual findings and transmit the same to this Court. The Superior Court also may reconsider any aspect of its decision on which those factual findings bear.[24]

The Supreme Court's decision to remand was driven by appellees' inability to explain, based upon a lack of an evidentiary record as to, "why Short Sale assigned its interest to FCS and why—as the winning bidder—Short Sale sought to vacate the Second Sheriff's Sale based on unfairness or prejudice to the Estate."[25] The Supreme Court determined that "[t]he legal merits of the parties' claims on appeal cannot be resolved until this Court addresses the attendant waiver, standing, and jurisdictional issues, which may turn on the unusual circumstances under which the appellees' motions came before the Superior Court."[26] The Supreme Court

---

[23] Case No. 306, 2023, D.I. 11.
[24] *Id.*
[25] *Id.*
[26] *Id.*

determined that further exploration was warranted to assess their impact on the issues before it.[27]

10.  Upon remand, the Court held a status conference with the parties on August 21, 2024.[28]  A period of discovery was permitted by the Court and a date of February 13, 2025, was given for the evidentiary hearing.[29]  Due to witness unavailability, the evidentiary hearing re-scheduled for June 23, 2025.[30]  The hearing was ultimately heard on June 30, 2025, due to the Court's trial obligations on June 23.[31]  The evidentiary hearing concluded on October 31, 2025.[32]

11.  On June 23, Short Sale and FCS jointly called one witness: Robert Stella (hereinafter "Stella"); FSC proffered no witnesses.[33]  At the conclusion of Stella's testimony, REO Trust, for the first time, announced its intention to call a witness from the Sheriff's Office, who was not present.[34]  Short Sale/FCS opposed and filed written opposition to REO Trust's request.[35]  Over objection, REO Trust

---

[27] *Id.*
[28] D.I. 62.
[29] *Id.*
[30] D.I. 69-71, 73.
[31]  D.I. 74.
[32] D.I. 82.
[33] D.I. 77.
[34] Initially counsel for REO Trust sought to call counsel for the Sheriff's Office, who was present at the hearing and engaged in the instant litigation.  This request was denied.  REO Trust then requested leave to call an employee of the Sheriff's Office, who was not present, on future day.  *Id.*
[35] D.I. 78-80.

was permitted to present the requested testimonial evidence and, on October 31, 2025, the second Evidentiary Hearing was held.[36] REO Trust presented the testimony of the Deputy Sheriff. In rebuttal, Short Sale/FSC re-presented Stella.[37]

12. The parties submitted supplemental briefing to address the issues on remand. On January 6, 2026, the parties, including the New Castle County Sheriff's Office, filed cross-briefs in support of their respective positions.[38] On February 3, 2026, cross-responses were filed by REO Trust and Short Sale and FCS, jointly.[39] Reply briefs by all were filed on February 10, 2026.[40] On June 4, 2026, the Court requested the parties reconvene for further argument on limited issues of law following remand.[41] All named and interested parties appeared and were heard.[42] This matter is now ripe for findings on remand.

**Legal Standard**

13. On remand from the Supreme Court, "the trial court must proceed in accordance with the mandate and the law of the case as established on appeal."[43]

---

[36] D.I. 82.
[37] *Id.*
[38] D.I. 87, 88, 89.
[39] D.I. 94, 96, 96, 97.
[40] D.I. 98, 100. No Reply was filed by the Sheriff's Office, as it elected to stand on the Opening and Answering briefs previously submitted. D.I. 99.
[41] D.I. 102.
[42] *Id.*
[43] *Bankers Trust Co. v. Bethlehem Steel Corp.,* 3rd Cir., 761 F.2d 943, 949 (1985) (citing *Briggs v. Pennsylvania R.R. Co.,* 334 U.S. 304, 306, 68 S. Ct. 1039, 1040, 92 L. Ed. 1403 (1948) (internal citations omitted)).

This Court must "implement both the letter and the spirit of the mandate, taking into account the appellate court's opinion and the circumstances it embraces."[44]

## Findings of Fact

14.     Short Sale and FCS's sole witness, Stella, provided clarity as to why Short Sale, who twice bought the Property at Sheriff's sale, immediately transferred its second winning bid to FCS and then contested the sale:  simply put, Stella is the managing member of both Short Sale and FSC.[45]

15.     Stella, a real estate developer for 47 years, is the principal and sole member of Short Sale, an LLC that owns a series of properties (condominiums) in Towne Estates Condominiums.[46]  Out of the 111 units in Towne Estates, Stella, via Short Sale, owns 90 units.[47]

16.     Stella is also the sole member of Financial Consulting Services Lending, also known as FCS Lending or FCS.  Stella owns "38 or 39" different companies, operating as separate entities, with separate books.[48]  Per Stella, it is not

---

[44] *Bankers Trust Co.,* 761 F.2d at 949 (quoting *Piambino v. Bailey,* 11th Cir., 757 F.2d 1112, 1119 (internal citations omitted)).

[45] D.I. 77; Tr. of Evidentiary Hr'g (Jun 30, 2025), D.I. 93, pp. 18-20 (hereinafter, D.I. 93) (D.I. 77 is the entry notating the evidentiary hearing was held; D.I. 93 is the transcript of the proceedings.  For purposes of citation, the official transcript will be cited to for both the June 30 and October 31, 2025, hearings.)

[46] D.I. 93, p. 19.

[47] *Id.* at p. 18.

[48] D.I. 93, p. 20.

uncommon for him to assign bids to properties he purchases, and his decision to assign a bid is dependent upon the situation and advice of counsel.[49]

17.    When the Property went up for sale on the execution of the condominium's lien, Short Sale was the sole bidder and purchased the condo for a very low price in the range of $1,200 - $1,500.[50]  At the initial sale, the Property was sold "subject to [the mortgage] lien[s]."[51]  Stella/Short Sale was aware that two mortgages encumbered the Property in an amount that exceeded the Property's value, which he surmised was why there were no other bidders.

18.    Following the sale, Stella, on behalf of FCS, approached each mortgage holder in an attempt to negotiate a buy out of the respective mortgages.  While FCS was successful in buying out the first priority mortgage, it was unable to buy out the second priority mortgage held by REO Trust.[52]

19.    Much testimony was given by Stella concerning his bewilderment at why REO Trust would proceed to a Sheriff sale after acknowledging it held the second priority mortgage and that the mortgage was worth more than the property.[53] Stella noted that in his 35 years of attending Sheriff sales, he rarely sees a second

[49] Stella, Short Sale, and FCS engaged the same counsel who executed the judgment on the condominium lien against the Property, which led to Short Sale's ownership.
[50] D.I. 93, p. 29.
[51] This fact was not testified to by Stella but rather is found in Paragraph 8 of the initial Complaint in foreclosure.  *See* D.I. 1, ¶8; *see also* D.I. 13, Ex. D.
[52] D.I. 93, p. 29-31.
[53] D.I. 93, pp. 28, 31-37.

priority lender foreclosing on a property.[54]   Prior to the sale, Stella engaged in written communication with counsel for REO Trust.   This correspondence, introduced at the hearing, documents REO Trust's concession that it held second priority status, and conceded that upon foreclosure, the first priority lender would be paid first.[55]

20.    The sale pursuant to REO Trust's foreclosure occurred on April 13, 2021.   Stella took much time to detail the events of the sale, which was the first sale since the COVID-19 shut down.   Stella did not intend to bid that day but instead went to observe.   The first bid came from REO Trust and was upwards of $90,000.  Surprised at the bid, Stella then decided to bid $1 more, lodging the winning bid.[56]  Believing he was effectuating a credit bid, Stella was unconcerned at the dollar amount.  As the first priority mortgage holder, he assumed he would be permitted to credit bid and did so under the belief that the payment would be credited to him as the owner of both Short Sale and FCS.[57]  Following the sale, counsel for Stella wrote

---

[54] Multiple references were made during the evidentiary hearing and subsequent arguments of counsel as to the respective number of years counsel has been working in this field as support for legal propositions.   As explained to counsel, the number of years "experience" is not controlling to the Court.   The Court is bound by the law and its application to the facts, and continuous arguments to the Court based merely upon personal experience is not helpful.

[55] This fact is not disputed by REO Trust, who now argues it erroneously made these representations.

[56] D.I. 93, p. 61.

[57] D.I. 93, p. 20.

to REO Trust, copying the Sheriff, requesting acknowledgment that FCS's mortgage would be paid first from the proceeds, as it held priority status. Neither REO Trust nor the Sheriff's Department responded.[58]

21. Shortly after the sale, Stella then assigned Short Sale's winning bid to FCS.[59]

22. From the start, Stella's ultimate goal was to purchase the condominium unit, a self-described strategic decision because Short Sale already owned several units in the same building.[60] Short Sale's later transfer of interest in the property to FCS was a distinction without a difference, as Stella owned both entities and FCS was the senior lien holder on the property.[61] Stella explained that being able to obtain a credit bid was determinative. In his mind, if the winner of the bid is the senior priority lien holder, the bidder obtains a set off for the amounts paid credited towards the senior position mortgage.[62]

23. At the October 31, 2025, evidentiary hearing, REO Trust called Deputy Sheriff Ronald Fioravanti.[63] The Deputy Sheriff explained the credit bid process, in which a bidder is permitted to forgo paying the required deposit, and ultimate

---

[58] *Id.* at pp. 54-55.
[59] D.I. 87 at ¶ 4, App. Tab 4.
[60] D.I. 93 at p. 18
[61] *Id.* at p. 77.
[62] D.I. 93, p. 83.
[63] D.I. 82; D.I. 92 (Tr. Of Evidentiary Hr'g (Oct. 31, 2025) at pp. 19-21 (hereinafter "D.I. 92").

payment on a property, if that bidder was owed money on that same property.[64] Instead of giving the Sheriff money that will ultimately be distributed back to the bidder, the Sheriff offers a credit in the amount in which the bidder is owed. Credit bids are typically given to foreclosing plaintiffs who have bid on a property.[65] In the event that a non-foreclosing first priority lienholder bids on a property, any amount bid in excess of the foreclosing mortgage that remains can be a credit bid.[66] Specifically, the Deputy Sheriff stated:

> QUESTION: Have you ever witnessed a situation where someone -- here a person who had a lien on the property going to sale but was not the foreclosing lender -- was bidding on property?
>
> DEPUTY SHERIFF: I went into our database, and I was able to identify three cases where the first mortgage holder purchased a property at sheriff's sale. And in those three cases, the first mortgage holder paid the [67] money that was owed to the party who brought the action. They paid that. And then any money that exceeded cost and what was owed to the party who brought the action -- they were allowed to credit bid the remainder of whatever their high bid was.[58]

24.     Fioravanti, who is familiar with Stella from frequently seeing him at these sales, recalled Stella having the misconception that he could credit bid on the date of the sale in question.[68] Much ado was made, initially by Short Sale/FSC regarding confusion that occurred over Stella's misconception. It is clear there was

---

[64] *Id.* at pp. 20-21.
[65] *Id.* at pp. 19-21, 33.
[66] *Id.* at p. 22.
[67] *Id.*
[68] *Id.* at pp. 22, 67.

confusion, Stella left the sale assuming he would be allowed to credit bid; he was not allowed and was called back to the sale. Ultimately, the required deposit was paid.[69] The Deputy Sheriff testified that the Sheriff's Office has "no dog in this fight" and simply wants to ensure they are distributing proceeds according to the law.[70]

25. Following the Deputy Sheriff's testimony, Stella was recalled. Stella testified once again to the events that took place given the confusion regarding whether he could credit bid.[71]

## Subject Matter Jurisdiction & Waiver

26. This Court permitted Short Sale/FCS's belated challenge to the sale procedure, given the jurisdictional challenge raised, despite no good reason being provided for the failure to raise this claim earlier to avoid the limitations of Superior Court Rule of Procedure 12. The evidentiary hearing revealed what was suspected all along: there was no good reason for the delay, especially now knowing that the owner of Short Sale and FCS are one in the same. However, because of the nature of the challenge – to this Court's jurisdiction, the claim, as frustrating as it may be, must be heard. Superior Court Civil Rule 12(h) states that a challenge to the Court's

---

[69] D.I. 92, p. 22, 34; D.I. 93, p. 76.
[70] *Id.* at p. 66.
[71] *Id.* at p. 71.

subject matter jurisdiction cannot be waived. Therefore, based upon that premise, the Court heard the matter.

27. The Court having entertained that challenge in no way condones the practice of sitting and waiting on a challenge which was able to have been brought much earlier. The expanded record makes clear the Court's suspicions that once FCS realized that it would not be paid, and its post-sale efforts to engage with both the Sheriff's Office and REO Trust failed, it considered its options and ultimately sought to vacate the sale under the guise that a defect in the process stripped Superior Court of jurisdiction.

28. It is certainly understood and agreed that judicial economy has not been served by Short Sale and FCS's belated challenge. Over the last few years of litigation, much time has been spent by the parties, their counsel and both the Superior and Supreme Courts on this issue. To this point, the Court wholeheartedly agrees with and shares in the frustration held by REO Trust.

29. Following the evidentiary hearing, there remains no evidence of prejudice and vacating the sale on a technical defect would result in the waste of judicial and government and other resources that REO Trust argued, albeit in the vein claim of waiver. Further, nothing was presented to suggest that Short Sale or FCS has standing to challenge this sale on behalf of the Estate. The record is silent as to how these parties have any relationship, other than the Estate owning a

condominium in the development in which Stella was trying to unilaterally acquire. The interests of justice do not require the Court to vacate the sale of the Property and that has not changed.

30. What has been waived is the new challenge that Short Sale and FCS raised in the briefing of this matter: the fact that the sale should be voided if the proceeds are not distributed to FCS, as a first priority lender. This new argument, premised on a mistake of fact that led to the purchase – is surely waived as it was not initially before the Superior Court, was not before the Supreme Court and beyond the scope of the remand order. A party is deemed to have waived any arguments not raised in their brief on appeal and "cannot raise anew on remand an issue that it failed to pursue on appeal."[72] Accordingly, it will not be considered.

31. Superior Court is appreciative of the opportunity granted by the Supreme Court to reevaluate its analysis of the issues presented following the expansion of the record. However, nothing was presented by either party that suggests the Court should not hear a challenge to subject matter jurisdiction, even in a foreclosure action where it is quite clear that Superior Court has jurisdiction over these procedures, as such a challenge cannot be waived. It is clear now, that Stella is the owner of both Short Sale and FCS, and as a result, REO Trust is correct,

---

[72] *Emerald Partners v. Berlin*, 2003 WL 21003437, at *43 (Del. Ch. Apr. 28, 2003), aff'd, 840 A.2d 641 (Del. 2003).

knowledge of a potential defect can be imputed upon both parties. However, the fact remains that the challenge to the sale was a claim of jurisdiction. And that is what the Court entertained, as a jurisdictional challenge cannot be waived.

32. The Court's entertainment of this challenge here may unfortunately allow opportunity for nefarious gamesmanship in the future, in that a party can simply repackage a procedural challenge by raising a jurisdictional challenge. However, the Rules of Professional Conduct guide and control an attorney's obligations with respect to ethically raising claims before a tribunal. The evidentiary hearing made clear that each side went into this sale with differing expectations. Whatever the reasons may have been, Short Sale and FCS found a creative way to challenge the sale upon learning the proceeds might not be distributed in the way in which it initially assumed.

33. Nonetheless, nothing was developed to lead the Court to believe that jurisdiction is not proper or that the creative issue raised before the Court was waived. The Superior Court has jurisdiction over mortgage foreclosures and properly exercised that jurisdiction when confirming the now contested sale of the Property.[73]

---

[73] 21 *Del. C.* § 2101.

## Standing

34.     Finally, REO Trust contends that FCS does not have standing to challenge the validity of the foreclosure sale because they bought a controversial bid fully aware of the risks involved.[74]  Specifically, REO Trust argues that FCS cannot seek relief as an interested party when it bought the winning bid from Short Sale fully aware of the issues that existed, evidenced from the fact that Stella had been informed by the sheriff after the sale on April 13, 2021, and before the assignment, that the first mortgage holder would not receive the proceeds from the sale.[75]  This has all been confirmed through the evidence presented on remand.

35.     A party who has an interest in the property sold, or in the proceeds of an execution sale may object to the confirmation of the foreclosure sale.[76]  Because FCS is the senior mortgagee on the Property, they are an interested party, with standing, to challenge the validity of the foreclosure sale.[77]

36.     Nothing, however, was presented to show how Short Sale or FCS has standing to challenge the sale on behalf of the Estate.  This has remained steadfast since the inception of this case.

---

[74] D.I. 86 at ¶ 12.
[75] D.I. 87 at ¶ 12, D.I. 93 at 78:4-19.
[76] *Burge*, 648 A.2d at 418 (citing *Petition of Adair,* Del. Super., 190 A. 105, 107 (Del. Super. 1936) (internal citations omitted)).
[77] *Id.*

## Distribution of Proceeds Clarified

37.     When it initially purchased the Property, Short Sale, via Stella, knew it remained encumbered by two mortgages.  In fact, any interested party was aware it was so encumbered because the Property was specifically sold "subject to" the mortgages.[78]   Mortgages, unlike general liens, are not extinguished upon a Sheriff Sale, that much is clear.[79]  We now know that upon purchasing the Property, Short Sale transferred its interest to FCS, who tried to negotiate the purchase of the two mortgages which encumbered the Property.  FCS was only successful in doing so for the first priority mortgage.  For whatever reason, however, FCS was not successful in purchasing the second priority mortgage from REO Trust.

38.     A letter was introduced at the evidentiary hearing which was previously part of the record below: a letter from REO Trust in which it acknowledged its second priority status and that as a result, it would collect sale proceeds after FCS.[80]  CITE.  REO Trust, in these proceedings, takes the position that the letter was an erroneous legal position and it is not bound by its statement.[81]

39.     Despite this acknowledgement by REO Trust, there is no record evidence that when it executed its judgment and filed its Complaint seeking sale of

---

[78] D.I. 13, Def's Mtn. to Set Aside Sheriff Sale, Ex. D; D.I. 76, Ex. A.
[79] 10 *Del. C.* § 4985.
[80] D.I. 93 at pp. 43-46.
[81] D.I. 102.

the Property, that it was to be sold "subject to" the first priority mortgage held by FCS. Following the evidentiary hearing, and pursuant to the allowance given by Supreme Court to revisit its original Opinion, should the record evidence develop accordingly, the Court will take this opportunity for reflection and clarification of its original ruling.

40.    The evolving decisional law in conjunction with Judge Woolley's Treatises in this area of law is anything but clear.[82] In a matter of what appears to be a matter of first impression in the written form, the issue of distribution of proceeds when two mortgages encumber a property needs to be clearly decided. REO Trust and the Sheriff have implored the Court to follow what has been the previous operation of the New Castle County Sheriff's Office. REO Trust repeatedly urged the Court to simply "look to the statute" for clarity, but "the statute" – 10 *Del. C.* § 4985 does not speak to the order of distribution with two competing mortgages.

41.    Title 10, Section 4985 states:

Real estate sold by virtue of execution process shall be discharged from all liens thereon against the defendant, or against one or more of the

---

[82] The Court wholeheartedly appreciates and agrees with the Superior Court's sentiment regarding the lack of clarity and archaic language used in the statutes governing this area of law that was expressed in its opinion: *CACH, LLC. v. Eastern Savings, FSB*, 2011 WL 4730525at *5 (Del. Super. Sept. 30, 2011). It is the Court's hope that, between this Order and the ultimate finding of the Delaware Supreme Court, that clarity and modern day plain English can be injected into the interpretation of the statute.

defendants, if there is more than one, whose property such real estate is, except such liens as have been created by mortgage or mortgages prior to any general liens; and with respect to such, the sale shall be a discharge to the extent to which the proceeds thereof may be legally applicable to a judgment or judgments obtained for the debt, to secure the payment of which the mortgage or mortgages respectively, if there is more than one, appear to have been given, and the real estate shall also be discharged from all right of dower and curtesy therein of any defendant in the execution.

What the statute makes clear is that a mortgage lien is not extinguished upon a sale of property which occurred due to the execution of a general lien. General liens are extinguished, mortgage liens are not, and any sold property is still so encumbered. This statute does not, however, delineate the distribution of proceeds when a second priority mortgage forecloses in execution of its judgment lien.

42. Section 4985 was interpreted by Judge Woolley in § 1140 of his Treatise regarding the distribution of proceeds upon the sale of property upon execution of judgment. Judge Woolley provides an illustration discussing distribution of proceeds between mortgage liens and general liens. While he does not discuss this scenario, the example does provides guidance. Judge Woolley states that when a property is encumbered by both mortgage and general liens, and the general lien is the executing force, the property remains encumbered by the mortgage lien and the proceeds are distributed to the general liens in order of priority. Judge Woolley states that in that scenario, "[t]he first lien being a lien 'created by mortgage' and being *prior* to a general lien, is within the exception [of Section 4985]

and is not discharged by the sale and does not share in the distribution of proceeds…The land is purchased *subject* to the mortgage lien and it is discharged from all liens subsequent to it, whether the proceeds are sufficient to reach and satisfy all of them or not."[83]  This is consistent with § 4985, and with the history of this very case.

43.    When the Property was first sold due to the condominium's lien execution, it was specifically sold subject to the outstanding mortgage liens.  This is consistent with the only developed decisional case law in this area, both *Cedar Inn v. Kings Inn*[84] & *Eastern Savings, FSB. v. CASH, LLC.*[85]  The facts of *Cedar Inn* are similar to the case at bar, in that the property at issue was encumbered by two mortgages, along with judgment liens, and the foreclosing party held a second priority mortgage.

44.    Importantly, in *Cedar Inn*, not only was there an agreement between the two mortgage holders that Cedar Inn, the second mortgage holder, would foreclose, but the agreement included that the property would be sold subject to the first mortgage, held by Delaware Trust Company.  This fact was read aloud at the time of sale, as well.   Upon a challenge to the sale by a third party, the Superior

---

[83] Victor B. Woolley, Practice in Civil Actions and Proceedings in the Law Courts in the State of Delaware, §1140 (1906) (emphasis in original).
[84] *Cedar Inn v. King's Inn, Inc.*, 269 A.2d 781 (Del. Super. 1970).
[85] *Eastern Savings Bank, FSB v. CACH, LLC.*, 55 A.3d 344 (Del. 2012).

Court turned to Section 1140 of Judge Woolley's Treatise. *Cedar Inn* Court held that Delaware Trust Company was only allowed to participate in the distribution of proceeds as a general lienholder, as it had secured its mortgage bond with a judgment bond, which had first in time, first in line priority over all other general liens. In so finding, the Court denied the motion to set aside the sale.[86]

45. In *Eastern Savings*, the Delaware Supreme Court examined *Cedar Inn*, and reaffirmed that 10 *Del. C.* § 4985 is "first in time, first in line," pure race recording statute.[87] The facts of *Eastern Savings* were different than the facts presented here, in that the two liens in question were a general lien and a mortgage lien. The general lien had priority, as it was filed prior to the mortgage. The mortgagor, Eastern Savings, foreclosed. When the Sheriff's office distributed the proceeds to Eastern Savings prior to CACH, the holder of the general lien, CACH sued in the Court of Common Pleas, alleging misappropriation of funds and unjust enrichment. Eastern moved to dismiss, CACH moved for summary judgment. The court granted the motion to dismiss and CACH appealed to Superior Court. The Superior Court reversed, holding pursuant the first in time judgment lien must be paid before the later mortgage lien, even though the mortgagor was the foreclosing party. On appeal, the Delaware Supreme Court examined both the order of priority

---

[86] *Cedar Inn*, 269 A.2d at 787.
[87] *Eastern Savings*, 55 A.3d at 349.

in distribution of proceeds, as well as what liens are extinguished upon the sale of property by execution.

46.     *Eastern Savings* interprets § 4985 as Judge Woolley did: all non-mortgage liens are extinguished upon the sale of property by execution.  With respect to the distribution of proceeds issue, the Eastern Savings Court examined *Cedar Inn*. The Court ruled that sale proceeds are distributed according to the first in time, first in line priority, and ultimately affirmed the Superior Court's ruling that CACH is to be paid, given its priority lien status, despite the fact that CACH was not the foreclosing party.[88]  Noting that *Cedar Inn* did not provide the rule of law it applied when ruling, the Court turned to Judge Woolley's Treatise again, and found that because "[n]o Superior Court judge has ever issued a decision that would directly contradict Judge Woolley's interpretation of the applicable statutory law[,]" the only logical rule of law that *Cedar Inn* could have applied would be the first in time, first in line rule of priority in distribution.  Therefore, the Superior Court's judgment was affirmed and the first filed priority lien was entitled to priority distribution in proceeds despite not being the executing party.[89]

47.     The Superior Court decision that *Eastern Savings* affirmed noted, that:

> [R]equiring proceeds of a foreclosure sale to first satisfy a lien perfected
> before the mortgage was recorded is also a fair result. Prior to the
> execution of the mortgage a title search is usually performed to

---

[88] *Id.*
[89] *Id.* at 351.

determine if there are any judgments against the property. If such judgments exist and the bank decides to proceed with its loan, it does so at its own risk and with full knowledge of the prior judgment. The bank should not be allowed to ignore or circumvent the prior judgment simply because it is the party instituting the foreclosure proceedings.[90]

Here, not only did REO Trust have an obligation to research its assumed risks, it affirmatively acknowledged that it was a second priority mortgage holder.[91] In fact, in the letter introduced at the evidentiary hearing, REO Trust seemingly admits that its decision to foreclosure was a "business decision." Specifically, then-counsel for REO Trust stated:

> My client is also aware that there is a senior mortgage on the property. My client's decision to pursue foreclosure despite this is a business decision by them, for which I cannot offer any explanation. They have chosen to foreclose, as is their right. We are aware that the first mortgage will be paid before our mortgage. My client is not able to accept any amount other than the total debt due to the equity position.[92]

48. Despite having multiple opportunities to present evidence, there was nothing presented by either party at either evidentiary hearing as to whether the contested sale of the Property was sold "subject to" the first priority mortgage. This matters. The *Cedar Inn* decision was based upon the fact that the Property was sold subject to the Delaware Trust mortgage, which is why all parties agreed the mortgage held by Delaware Trust would not partake in the distribution of proceeds.

---

[90] *CACH, LLC. v. Eastern Savings, FSB*, 2011 WL 4730525at *5 (Del. Super. Sept. 30, 2011).
[91] D.I. 88, App. A158.
[92] *Id.*

49.     Such a reading is also consistent with the testimony of the Deputy Sheriff, who noted that in the rare case in which a second priority lender forecloses and the first priority mortgagor is the purchaser, a credit bid can be issued – it is only issued, however, once the foreclosing party's debt is satisfied. Any remaining funds will go to the first priority mortgage. The Sheriff's Office has not taken the position that the first priority mortgage is not to be paid at all. This practice of the Sheriff's Office evidences an acknowledgment that the first-priority mortgage should be able to partake in the distribution of proceeds. In what order of succession is what is decided here.

50.     Importantly, Judge Woolley notes that land purchased upon execution of a judgment is, "*subject* to the mortgage lien, and it is discharged from all liens subsequent to it."[93] Therefore, unless a sale is noted to be sold subject to the first mortgage, given that mortgage liens are not discharged from a property upon execution of sale, the proceeds must be distributed in a first in time, first in line priority order. Otherwise, lien priority has no benefit.

51.     Therefore, after much deliberation and consideration of the respective positions of the parties, the expanded record, and the limited legal authority on this issue, the initial decision of Superior Court is amended to clarify that the execution sale proceeds are to be distributed in order of priority, regardless of the foreclosing

---

[93] Woolley, § 1140.

party, unless that sale is made subject to any prior mortgage encumbrances. Again, the Court appreciates the leave given by the Supreme Court for such an amendment and is confident that the Supreme Court will bring further clarification to this issue. This conclusion should prove to alleviate any unintended burden on the Sheriff's Office, as it is the foreclosing party's assumed risk and responsibility to ensure that an execution sale is both properly noticed and properly conditioned for sale, subject to any applicable priority liens.

**IT IS SO ORDERED.**

_____
Danielle J. Brennan, Judge


cc:  All parties via LEXIS File&Serve Express